**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| WILLIAM JENNINGS,<br>    *Plaintiff,*<br><br>     v.<br><br>TOWN OF STRATFORD,<br>    *Defendant.* | No. 3:13-cv-1664 (JAM) |

**RULING ON POST-TRIAL MOTIONS**

Plaintiff William Jennings was a police officer in Connecticut for defendant Town of Stratford for many years. After he criticized what he thought was corrupt action by a captain in the police department, the police department retaliated against him in numerous ways, and plaintiff ultimately resigned. Plaintiff then filed this lawsuit, contending that the Town of Stratford retaliated against him on the ground of his exercise of his right to free speech under the federal and state constitutions. Following a three-day trial, a federal jury agreed with plaintiff and awarded him $1 million in compensatory damages and $1.5 million in punitive damages.

Several post-trial motions have ensued. For the reasons set forth below, I will deny defendant's motions to challenge the verdict and damages award, except to the extent that I will conditionally grant a new trial unless plaintiff accepts remittitur of the punitive damages award to an amount of $500,000. I will grant in part and deny in part plaintiff's motion for attorney's fees to allow for an attorney's fee of $500,000 (subject to plaintiff's acceptance of remittitur of the punitive damages award).

**BACKGROUND**

The facts set forth below are based on evidence introduced at trial and presented in the light most favorable to the jury's verdict in plaintiff's favor. Plaintiff began his decades-long tenure with the Stratford police department in the late-1980s. By 1999, he had earned the rank of

1

detective and, soon thereafter, was assigned to the Special Services Narcotics and Vice Unit (also known as Special Services), where he received specialized training. After several years with Special Services in roles that often involved undercover work, plaintiff was offered a position to work with the federal Drug Enforcement Administration (DEA) as part of a statewide task force.

The DEA position was coveted by many local police officers. It came with the prestige of federal agent status and credentials issued through the Department of Justice, as well as the opportunity to investigate drug trafficking that included local, statewide, national, and at times international cases. Doc. #65 at 76. Although plaintiff remained an employee of the Stratford police department and was subject to being replaced on the DEA statewide task force by a different Stratford police officer every two years, plaintiff had succeeded in renewing and maintaining his task force position with the DEA for almost nine years. Plaintiff thrived in the DEA position; he was pursuing his dream career working essentially as a federal agent, often in undercover roles, and he had passed up promotion opportunities within the Stratford police department in order to continue his work with the DEA. Doc. #66 at 30. Plaintiff had been previously "assured that I'd be there and not to worry about" being removed from the position. Doc. #65 at 126.

### *The McNeil Scandal*

Plaintiff's position with the DEA often kept him physically away from the Stratford police department, but he nevertheless remained a detective there, privy to internal politics within the department and, as relevant to this case, to a particular scandal that embroiled the department in 2008. As the story went, the brother of the Stratford mayor had applied to become a police officer. Joseph McNeil, a captain in the Stratford police department who disliked the mayor, decided to illegally access the mayor's brother's confidential background report and leak

it to the press. When confronted about accessing the application, McNeil lied to internal investigators despite the chief of police's direct order to cooperate fully in the investigation. McNeil's lies were eventually exposed, and he was soon suspended without pay and demoted from the rank of captain. *See* Exh. 5 at 5. McNeil was later criminally charged with computer misconduct stemming from his role in the access of the mayor's brother's application, and those criminal charges immediately became statewide news. *See* Exhs. 6, 7.

Despite all the controversy, McNeil remained president of the local police union, around the same time that plaintiff served as vice president of the statewide police union. At a statewide police union convention in 2008, plaintiff was approached by union members who were curious about the news of McNeil's actions and suspension. This angered McNeil, who believed that plaintiff was spreading rumors about him. McNeil confronted plaintiff at the convention, and they had an extremely heated exchange that resulted in lasting animosity by McNeil towards plaintiff.

McNeil's fortunes took a turn for the better. By January of 2011, the criminal charges had been dismissed, and McNeil was restored to active duty. He was reinstated as a captain, and he was awarded full back pay, at a cost of $300,000 to the taxpayers of the Town of Stratford.

What happened between 2008 and 2011 to change the tides so favorably for McNeil? First, the local police union—in which McNeil maintained a leadership role—aggressively supported the candidate running to unseat the mayor, and the union succeeded in placing its preferred candidate into power. The result for McNeil was the ouster of the mayor whose brother McNeil had embarrassingly exposed to the press. Second, the local police union—with McNeil's participation—took a vote of no confidence against the police chief. After that vote, the incumbent chief left the department, and Patrick Ridenhour was elevated to acting (and soon-to-

be actual) chief of police. The upshot was that McNeil was free from the police chief who had disciplined him for illegally accessing the mayor's brother's file and then lying about it to internal investigators.

Finally, the local police union—with McNeil's participation—renegotiated its collective bargaining agreement with the Town of Stratford. The new deal was quite advantageous for the Town, and McNeil presented the proposed agreement to the police union as a foregone conclusion, requesting ratification in a manner that seemed unusual and rushed, threatening layoffs in the event the union did not approve. Connecting the proverbial dots, plaintiff thought McNeil had engineered some kind of a quid pro quo deal with the Town: in exchange for his pushing through a collective bargaining agreement that was favorable to the Town at the union's expense, McNeil would garner reinstatement to his position as captain as well as a $300,000 backpay award.

At least that's what plaintiff believed. He thought that McNeil's good fortunes in having his charges dropped, being reinstated to his position as captain, and being given hundreds of thousands of dollars in back pay, was all no coincidence. And he decided to speak his mind about these concerns.

### *Plaintiff's Protected Speech*

On March 18, 2011, plaintiff was in the police department parking lot chatting with Sergeant David Gugliotti when the subject of McNeil came up. Plaintiff told Gugliotti that he was unhappy with the newly renegotiated collective bargaining agreement, and he said he believed McNeil had sold out the interests of the police union during contract negotiations in order to get his position back as a captain in the police department. He deemed McNeil's actions to be "corrupt."

The parties have agreed—and the jury was instructed—that these comments to Gugliotti were constitutionally protected speech. Gugliotti and plaintiff ended their conversation and went home, apparently without incident. But plaintiff's words in the parking lot that day set in motion what the jury found to be a concerted effort by the police department to end plaintiff's career because of his exercise of his rights to free speech.

### *Retaliatory Actions Against Plaintiff*

Plaintiff soon learned that he was being investigated for what he had said about McNeil. Indeed, the investigation was set in motion by McNeil himself: Gugliotti had gone right to McNeil—skipping over any lieutenant in the normal chain of command—to tell him what plaintiff had said, and then McNeil in turn had gone right to then-deputy police chief Ridenhour. Docs. #65 at 113–14; #66 at 53. After talking to McNeil, Ridenhour brought it up the chain of command to the soon-to-be ousted chief of police, who ordered an internal investigation into plaintiff's statements about McNeil. Doc. #66 at 54.

In the meantime, plaintiff continued on at work until he got himself into more disciplinary hot water because of an incident that occurred on April 18, 2011. On that day, plaintiff went to the home of a former DEA informant, David Fredericks, in order to collect a personal debt for a fellow federal agent, *see* Exh. 502 at 14, a decision he would agree at trial was a lapse in judgment. Fredericks reacted angrily to plaintiff's presence, and the police were called after Fredericks confronted plaintiff with a baseball bat. Fredericks eventually reported the incident to the press.

Ridenhour, who had been elevated to acting police chief almost the same day as the Fredericks incident, decided on May 17, 2011, to commence an internal investigation into plaintiff's conduct during that incident. He assigned Lieutenant Celeste Robitaille to investigate

the Fredericks incident, notwithstanding that Robitaille's direct supervisor—to whom Robitaille reported on a daily basis—was none other than plaintiff's nemesis, McNeil. Doc. #66 at 114–15.

Two days later, Ridenhour imposed discipline—a written warning—for plaintiff's statements about McNeil. The warning characterized plaintiff's constitutionally protected statements about McNeil as "derogatory and disparaging" and "without merit," and concluded that they could "not be tolerated" under the Town's ethics policy. *See* Exh. 10. The jury found this written warning to be an adverse employment action that was substantially motivated by the fact that plaintiff had engaged in constitutionally protected speech.

The next day, plaintiff went to his immediate supervisor, Captain John Popik, to discuss the written warning penalizing him for his constitutionally protected speech. Plaintiff indicated that he intended to grieve the warning, to which Popik replied with a threat from McNeil. As plaintiff recounted at trial, "Captain Popik told me that Mr. McNeil said that if I grieved this, there would be repercussions in the future and I would end up like he did on review of the Connecticut POST Academy for potential arrest and losing my certification." Doc. #65 at 121. The jury found Popik's threat to plaintiff not to grieve his written warning to be an adverse employment action substantially motivated by the fact that plaintiff had engaged in constitutionally protected speech.

Plaintiff immediately reported Popik's threat to Ridenhour in an e-mail with the subject line "request of internal investigation." In the e-mail, plaintiff described Popik's threat—that if plaintiff grieved the written warning, he would be investigated and/or disciplined—and indicated that he felt "threatened and manipulated" by a McNeil-friendly faction of the police department, Exh. 11. Plaintiff then asked Ridenhour to investigate "the direct threats made to me regarding this decision [to grieve the warning]." *Ibid.*

Ridenhour replied on May 23, 2011, that he would carefully evaluate plaintiff's

allegations about the threats to determine whether a formal investigation was warranted. *Ibid.*

A week later, however, plaintiff had still not heard anything about an investigation into Popik's

threat or about McNeil's involvement in the threat. Worried, plaintiff sent an emotional e-mail to

Ridenhour about the situation:

> Sir,
>
> I have had the opportunity to sit with my attorney to discuss the most recent threats upon my decision to file a grievance on the written warning . . . . I also discussed the complaints filed by me in an attempt to stop the harassment which were never dealt with. We came to a simple agreement that I am a target of a supervisor that apparently will not stop until my career is negatively affected by his actions. I will not allow this hostile environment to blemish my career.
>
> After 24 years of working in this department I have faced no disciplinary action or had so many INTERNAL complaints filed against me. The rumors of Captain McNeil wanting me out of DEA have been flowing for years. . . .
>
> All [McNeil] has done is created a detective that can't trust his union and a detective that has minimal supervisors to turn to for guidance and assistance. . . .
>
> This is indeed a hostile environment to work in even though I am in an outside assignment.
>
> The [internal investigation] involving Sgt. Gugliotti and I [regarding my statements about McNeil] should not have gone as far as it did and would not have if Captain McNeil did not influence same. . . .
>
> I have already been advised that when I am back at my PD, I can expect more issues from Captain McNeil. Besides documentation, all I can do is wait and fight the immature actions by a hell bent supervisor with the mayor on speed dial. My family and I will not tolerate it and I am not retiring!!.

Exh. 12. Plaintiff ended his e-mail by requesting an update on whether Ridenhour had launched

an internal investigation into the threat plaintiff had received from Popik. *Ibid.* At trial,

Ridenhour testified that he could not recall responding to this e-mail; he further stated that he did

not open an investigation into Popik's threat to plaintiff or McNeil's involvement in the threat. Doc. #66 at 117–18.

Plaintiff received another blow on June 17, 2011, when he learned that Ridenhour had removed him from his position on the DEA Task Force. This occurred even before a suitable replacement had been located or before the investigation into the Fredericks incident had been completed. *See* Exhs. 500, 501, 502.

The jury found that plaintiff's removal from the DEA position was an adverse employment action substantially motivated by the fact that plaintiff had engaged in constitutionally protected speech. In doing so, the jury necessarily discredited Ridenhour's stated reason for having removed plaintiff: pressure from the DEA to remove plaintiff once news of the Fredericks incident hit the press. *Compare* Doc. #66 at 86 (removed plaintiff "shortly after" the Fredericks incident made the local news), *with id.* at 87, 89 (no recollection of whether anything about the Fredericks incident had been reported before June 17, 2011) *and id.* at 88-89 (identifying an article about the Fredericks incident updated on July 6, 2011), 28 (same).

At the time plaintiff was removed from the DEA position that he had held for nine years, he had taken a valid medical leave of absence. He was still in that medical leave of absence by the time the Fredericks investigation concluded and when he was called in to a disciplinary hearing. Plaintiff attended the disciplinary hearing with three union representatives who would not even look at him. And after plaintiff watched his union attorney have a conversation with either Ridenhour or Ridenhour's representative, he was told by his attorney that if he did not sign an agreement stipulating to discipline for the Fredericks incident, his attorney believed the Town would fire him. Doc. #65 at 143. The agreement given to plaintiff that day imposed 10 days' suspension for the Fredericks incident and waived plaintiff's grievance rights. *See* Exh. 504.

Realizing then that plaintiff had no support even from his union, and no choice but to sign the stipulation-for-discipline or face being fired, plaintiff reluctantly signed the stipulation. Doc. #65 at 143.

### *Constructive Discharge*

By then, plaintiff remained in the process of grieving the written warning with the assistance of a private attorney, but he had already been removed from the DEA and been presented with no option other than to agree to suspension for the Fredericks incident. Even had he immediately returned to work from medical leave, his assignment within Special Services had yet to be determined, Exh. 500, which injected a level of uncertainty plaintiff could no longer bear in light of all he had faced. By this time, he had told many of his superiors about being targeted by McNeil, and yet nobody had taken plaintiff seriously or looked into the matter. Doc. #65 at 182–83 (Popik and Pinto, in addition to Ridenhour).

With the writing on the wall, and no one in the police department that was willing to cross McNeil to help him, plaintiff felt he had no choice but to retire. *See* Doc. #65 at 154, 225, 228. He tendered his resignation on January 6, 2012, Exh. 509, and in doing so was forced to accept a lower pension than he would have received had he stayed. Doc. #65 at 156. Even during the meeting with the director of Human Resources, Ronald Ing, to discuss his premature retirement, plaintiff explained that harassment and being targeted was the reason he was retiring. Doc. #66 at 145. Like the others, Ing told plaintiff he could file a complaint, but plaintiff felt it would be futile. After all, it had been Ing who—in consultation with the newly elected mayor

supported by McNeil's faction—had authorized McNeil's reinstatement and backpay. Doc. #66 at 147.[1]

Soon after plaintiff left the Stratford police department, McNeil was promoted to deputy police chief and, as of the date of trial, held the position of chief of police. Doc. #66 at 108–09. Despite plaintiff's main theory at trial (that McNeil was orchestrating efforts against him), defendant did not call McNeil at trial, and the evidence was otherwise strong in support of plaintiff's theory that he was on McNeil's blacklist for continuing hostile treatment at every turn. In August 2013, plaintiff won his grievance against the Town of Stratford for his written warning, Exh. 13, but by then it was only a hollow victory as he had already lost his career with the police department.

This lawsuit and trial followed. As relevant here, plaintiff alleged in his complaint that he was subject to retaliation by defendant on the grounds of his exercise of his right to free speech as protected under the federal and state constitutions. Doc. #1 at 5-8. The jury awarded plaintiff $1 million in compensatory damages and $1.5 million in punitive damages.

## DISCUSSION

Now before me are several post-trial motions: (1) defendant's motion for judgment as a matter of law or in the alternative motion for new trial (Doc. #70); (2) defendant's motion to alter or amend the judgment and motion to consider plain error in the jury instructions (Doc. #71); and (3) plaintiff's motion for attorney's fees (Doc. #74). I will first consider defendant's varied

---

[1] The jury had good reason to doubt the motive and credibility of Ing, who was present in court throughout the trial as defendant's representative. Ing testified that he had decided to reinstate McNeil in 2011, despite the huge cost to the taxpayers of the Town of Stratford, because he had concluded that McNeil's 2008 internal investigation had been unfair. But when pressed about what exactly had been wrong about the investigation of McNeil, Ing could not elaborate or identify any example of unfairness. Doc. #66 at 146–55.

challenges to the jury's verdict of liability, followed by defendant's challenge to the award of compensatory and punitive damages, and finally plaintiff's motion for attorney's fees.

### *Liability*

Defendant moves for judgment as a matter of law pursuant to Fed. R. Civ. P. 50 on the ground that the evidence was insufficient to prove (1) that the threat by Popik was an adverse employment action; (2) that plaintiff's removal from the DEA task force was an adverse employment action; and (3) that plaintiff suffered a constructive discharge. Doc. #70-1 at 1.

Under Rule 50, a motion for judgment as a matter of law will be granted only if "a reasonable jury [did] not have a legally sufficient evidentiary basis to find for the party" that prevailed at trial. Fed. R. Civ. P. 50(a)(1). A party seeking judgment on this basis bears a "heavy burden," and will succeed only if "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached." *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 52 (2d Cir. 2014). I must view the evidence "in the light most favorable to the party against whom the motion was made and . . . give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence." *Harris v. O'Hare*, 770 F.3d 224, 231 (2d Cir. 2014), *as amended* (Nov. 24, 2014). Moreover, notwithstanding a movant's reliance on trial evidence that favored the movant's version of events, a court considering a Rule 50 motion "must disregard all evidence favorable to the moving party that the jury is not required to believe." *ING Glob. v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 97 (2d Cir. 2014).

***Popik's threat.*** Defendant first argues that there was insufficient evidence for the jury to conclude that Popik's threat was an adverse employment action. For purposes of a First

Amendment retaliation claim, "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225 (2d Cir. 2006).[2]

The evidence easily sufficed for the jury to conclude that Popik's statement was a threat and that this threat would have deterred a person of ordinary firmness from exercising his free speech rights as plaintiff did. After receiving a written warning for his speech, plaintiff went to Popik—his supervisor—for help with respect to whether he should file a grievance from the written warning. Rather than assist plaintiff or simply do nothing, Popik instead threatened him with further repercussions of the kind suffered by McNeil when he engaged in far worse, not-constitutionally-protected conduct. Viewing the evidence in the light most favorable to plaintiff, Popik's threat with its potential career-ending consequences was significant enough to deter a reasonable and similarly situated person of ordinary firmness from exercising his constitutional right to free speech as plaintiff did.

*Removal from DEA.* Defendant next argues there was insufficient evidence for the jury to conclude that plaintiff's removal from his position with the DEA was an adverse employment action because the transfer from the DEA to Special Services was merely a lateral move. While it is true that plaintiff's base salary and rank remained the same after the transfer, plaintiff testified that he would have had fewer overtime opportunities in his assignment at Special Services. *See* Doc. #65 at 227–28. Moreover, the DEA position came with prestige and interesting assignments that were not available to a regular detective within the Stratford police department, Docs. #65 at

---

[2] Defendant's briefing confusingly cites *Zelnik* (Doc. #70-1 at 3) but then goes on to cite and rely on Title VII discrimination cases in support of its claim that there was no adverse action here (Doc. #70-1 at 4). In *Zelnik*, however, the Second Circuit took pains to distinguish the higher standard that applies to show an adverse action in the context of a Title VII claim for employment discrimination than to show an adverse action in the context of a First Amendment retaliation claim. *Zelnik*, 464 F.3d at 225–27. I choose to apply the proper First Amendment standard here.

76, #66 at 30. Even Ridenhour testified that the position was highly desirable. Doc. #66 at 82–83. The jury could have reasonably concluded that removal from this position, one which plaintiff had held and valued for nine years, would deter a reasonable person of ordinary firmness from exercising his constitutional right to free speech as plaintiff did.

*Constructive discharge.* Defendant further argues that there was insufficient evidence for the jury to find that plaintiff had been constructively discharged. "Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily. Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Serricchio v. Wachovia Sec. LLC*, 658 F.3d 169, 185 (2d Cir. 2011).

The Second Circuit has recognized that "a constructive discharge claim can be premised on the cumulative [e]ffect of a number of adverse conditions in the workplace." *Terry v. Ashcroft*, 336 F.3d 128, 153 n.24 (2d Cir. 2003). Even so, however, the availability of alternative avenues to resignation, such as complaint procedures, may preclude a finding of constructive discharge. *See Spence v. Maryland Cas. Co.*, 995 F.2d 1147, 1157 (2d Cir. 1993).

Defendant argues that the evidence of constructive discharge was deficient because plaintiff had other remedies available to him to protest his mistreatment. But the jury was instructed to consider whether plaintiff had alternatives to resignation, such as resort to the grievance process, in determining whether he had been constructively discharged. Doc. #61 at 8–9. The jury could reasonably have determined that a reasonable person in plaintiff's shoes would have felt compelled to resign his employment—that plaintiff was progressively being forced out of his employment and that resort to the grievance procedure would have been futile. After all,

plaintiff had already filed a grievance with respect to his written warning, which, rather than help to ameliorate the situation, provoked Popik's threat of severe repercussions if he protested being sanctioned for speaking out about McNeil and the perceived corrupt union deal. Plaintiff then implored Ridenhour as the acting police chief for help and asked that he investigate McNeil's acts of oppression against him. But Ridenhour ignored plaintiff. A complaint to director of Human Resources would have been equally futile, since Ing had personally approved of McNeil's questionable reinstatement. Even the mayor also seemed to be on McNeil's side. And when, despite the odds of successfully advocating for himself within the Town, plaintiff went to a disciplinary hearing on the Fredericks incident, he was told, after watching his union attorney meet with representatives from the Town, that, if he did not stipulate to his discipline and waive his grievance rights, it seemed likely that he would be fired. Doc. #65 at 143.

In light of this evidence and viewing it in the light most favorable to plaintiff, a reasonable jury could have concluded that plaintiff was constructively discharged and that a reasonable person would have believed that further resort to the grievance process would have been futile. *See Terry*, 336 F.3d at 152 (evidence sufficient for jury determination of constructive discharge where there was "pervasive, unabated harassment by [plaintiff's] supervisors" and where plaintiff was told his days were numbered and told by one supervisor that "'you're going to be brought up on more charges,'" such that "a reasonable person [could] infer that he was not wanted as an employee and that he was going to be forced out of the INS's employment").

Defendant further argues that plaintiff's absence from work as a result of his medical leave softened the blow of each of the several adverse employment actions found by the jury, such that plaintiff could not have felt compelled to resign at the end of his medical leave. But this was not a case in which proximity to bad actors caused plaintiff to feel a constant threat at work

or to be surrounded by continuing harassment. After all, plaintiff had been assigned outside the police department when he was subjected to his several adverse employment actions, and the fact of his outside assignment certainly did not impact the jury's determination that they were, in fact, adverse employment actions. *See also* Exh. 12 (plaintiff's email to Ridenhour stating: "This is indeed a hostile environment to work in even though I am in an outside assignment.").

Rather, this is a case in which the evidence sufficed to show that plaintiff was targeted with several intentionally devastating employment actions aimed at eroding the bedrock of plaintiff's career. That plaintiff was out on leave is of no moment, as evidenced by Ing's testimony that plaintiff remained preoccupied by being targeted even when filling out his retirement papers. *See* Doc. #66 at 145. The jury could have reasonably found that, regardless of whether plaintiff was at work or on a valid medical leave, the cumulative effect of these intentional actions levied at him would have caused a reasonable person in plaintiff's shoes to feel compelled to resign. The evidence was sufficient to support the jury's finding of a constructive discharge.

In the alternative, defendant also moves for a new trial on the constructive discharge issue. Rule 59(a) of the Federal Rules of Civil Procedure provides that the Court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." The standard for granting a motion for a new trial is lower than the standard for granting a Rule 50 motion—a judge "may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012) (citation omitted). Still, the Second Circuit has emphasized "the high degree of deference [that should be] accorded to the jury's

evaluation of witness credibility, and that jury verdicts should be disturbed with great infrequency." *Ibid.*

Nor is a motion for a new trial "a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple." *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998). The Court may only grant a motion for new trial "if the jury has reached a seriously erroneous result or [its] verdict is a miscarriage of justice," or "if substantial errors were made in admitting or excluding evidence." *Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 202 (2d Cir. 2014).[3]

Even applying the more generous standard of Rule 59, I conclude that a new trial on the issue of constructive discharge is not warranted. I have considered each of the aspects of testimony and evidence highlighted in defendant's papers. Doc. #70-1 at 20–29. Although the facts were somewhat intricate and not so compelling to admit of only one conclusion in plaintiff's favor, the jury had a sound basis to find that plaintiff had been constructively discharged—that he was and would be subject to continuing retaliation for his speaking out against McNeil and what he believed to be a corrupt deal engineered by McNeil between the police union and Town. The jury's verdict was not against the weight of the evidence, was not seriously erroneous, and was not a miscarriage of justice. I decline to second-guess the jury's careful judgment.[4] I will therefore deny defendant's motion for judgment as a matter of law and/or a new trial insofar as it challenges the jury's verdict of liability.

---

[3] Defendant does not claim that the Court erred with respect to its admission or exclusion of evidence.

[4] As the jury's verdict form reflects, it did not rule in plaintiff's favor with respect to all of his claims of adverse retaliatory actions. Doc. #60 at 1–2 (ruling in plaintiff's favor on 4 of 6 claims of adverse action). This is consistent with the Court's conclusion that the jury carefully weighed and discerned its judgment from the mix of evidence.

***Compensatory Damages***

Apart from his challenges to the jury's verdict of liability against him, defendant further challenges the size of the jury's award of damages. First, defendant challenges the jury's award of $1 million in compensatory damages insofar as the award appears to reflect a component of about $230,000 for emotional distress above and beyond plaintiff's evidence that he introduced at trial of about $770,000 in lost future wages and benefits due to his early retirement.[5]

The calculation of damages is the province of the jury, and courts will not "vacate or reduce a jury award merely because [the court] would have granted a lesser amount of damages." *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 162 (2d Cir. 2014). The calculation of emotional-distress damages, in particular, is "inherently speculative. There is no objective way to assign any particular dollar value to distress." *Ibid.* Even so, awards for intangible damages must be "fair, reasonable, predictable, and proportionate," and must not "shock the judicial conscience or constitute a denial of justice." *Ibid.* "Under Connecticut law, the relevant inquiry in determining whether an award is excessive is whether it falls within the necessarily uncertain limits of fair and reasonable compensation or whether it so shocks the conscience as to compel the conclusion that it was due to partiality, prejudice or mistake." *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 190 (2d Cir. 2016).

Defendant asserts that the jury's award of emotional distress damages in this case is not comparable to awards in other cases. But the other cases cited by defendant are not instructive, because they involve primarily *non*-First-Amendment-retaliation claims, *e.g.*, *Bouveng v. NYG Capital LLC*, 175 F. Supp. 3d 280 (S.D.N.Y. 2016) (sexual harassment claim); *Patterson v.*

---

[5] Defendant's post-trial motion initially challenged the entire award of compensatory damages but at oral argument defendant abandoned its challenge to the award of compensatory damages with respect to lost wages and benefits in light of the substantial evidence of such damages that was introduced at trial. Docs. #70 at 31, #85 at 22 ("THE COURT: But you're not challenging the 770. MR. HOLCOMB: No, Your Honor, I'm not.").

*Balsamico*, 440 F.3d 104 (2d Cir. 2006) (state law intentional infliction of emotional distress claim); *Meacham v. Knolls Atomic Power Laboratory*, 381 F.3d 56 (2d Cir. 2004) (state law age discrimination claim), or a plaintiff who suffered no forced retirement or termination, *e.g.*, *Olsen v. Cnty. of Nassau*, 615 F. Supp. 2d 35 (E.D.N.Y. 2009) (no termination or constructive discharge); *Dotson v. City of Syracuse*, 2011 WL 817499 (N.D.N.Y. 2011) (same). *See also DeCurtis v. Upward Bound Intern., Inc.*, 2011 WL 4549412 (S.D.N.Y. 2011) (damages imposed after motion for default judgment). Defendant also argues that the emotional distress suffered by plaintiff in this case was of a garden variety, as opposed to significant or egregious, arguing that plaintiff did not suffer severe injury or provide medical corroboration for his emotional distress. *See Olsen*, 615 F. Supp. 2d at 46 (stating that "garden variety" emotional distress claims generally merit awards of between $30,000 and $125,000).

I conclude that an award of $230,000 in emotional distress damages was fair, reasonable, predictable, and proportionate in this case, and reasonably within the range found in other, more comparable cases. *See McClain v. Pfizer, Inc.*, 2011 WL 2533670, at *2 (D. Conn. 2011) (declining to disturb jury's award of $685,000 in non-economic damages for First Amendment retaliation), *aff'd*, 505 F. App'x 59 (2d Cir. 2012); *Phillips v. Bowen*, 278 F.3d 103, 111 (2d Cir. 2002) (declining to disturb jury's award of $400,000 in emotional distress damages for First Amendment retaliation); *Lore v. City of Syracuse*, 670 F.3d 127, 179 (2d Cir. 2012) (declining to disturb jury's award of $150,000 in emotional distress damages for retaliation).

While plaintiff did not present medical evidence substantiating his distress, he testified with sincere emotion about how the loss of his career—the "career that was my life," Doc. #65 at 158—completely devastated him. His work had been more than a job to him: "It was a way of life," Doc. #66 at 30, the loss of which clearly continues to shake plaintiff, as evidenced by

plaintiff's demeanor during trial when he discussed his forced retirement. Plaintiff's live testimony was particularly helpful to the jury in this regard, taking this case out of the realm of a "garden variety" claim of emotional distress when coupled with (and made worse by) the offensive conduct of the highest decision-makers within the Stratford police department, an agency that has been tasked with upholding the laws of this state and country, not breaking them. *See Wallace v. Suffolk Cnty. Police Dept.*, 2010 WL 3835882, at *12 (E.D.N.Y. 2010). And after plaintiff was threatened with loss of his career to the point that he felt he had no choice but to resign, he then endured a significant period of unemployment following his forced retirement, causing him to draw down on his savings in order to support his wife and two young children. *See* Doc. #65 at 155. I conclude that the jury's award for emotional distress does not shock the judicial conscience and does not work a manifest injustice.

### *Punitive Damages*

Having concluded that the jury's determination as to liability was permissible, I now address defendant's various challenges to the jury's award of punitive damages. These challenges include: (1) that the Court erred by instructing the jury on punitive damages because the complaint did not expressly seek an award of punitive damages or expressly allege a violation of the statute (Conn. Gen. Stat. § 31-51q) that authorized a punitive damages award; (2) that an award of punitive damages was not supported by the evidence; (3) that the Court erred by failing to instruct the jury that an award of punitive damages should be limited to attorney's fees and costs; and (4) that the award of punitive damages was otherwise excessive. *See* Docs. #70-1 at 33–35; #71; #89.[6] I will consider each of these challenges in turn.

---

[6] Defendant did not initially challenge the jury's verdict on the ground that the complaint did not allege a violation of § 31-51q; it has pursued the argument only in response to the Court's *sua sponte* order for supplemental briefing on this issue. Docs. #87, #89. The fact that defendant did not raise this argument in the first instance

*1. Adequacy of complaint as to punitive damages*

Defendant argues that punitive damages should not have been awarded because the complaint neither sought punitive damages nor expressly cited the statute (Conn. Gen. Stat. § 31-51q) that served as the basis for the jury to consider an award of punitive damages. I do not agree.

First, as to the lack of a punitive damages demand in the complaint, the Federal Rules of Civil Procedure make clear that this omission does not preclude the Court from instructing the jury on punitive damages. *See* Fed. R. Civ. P. 54(c) (stating that a default judgment may not exceed "what is demanded in the pleadings" but that "[e]very other final judgment should grant the relief to which each party is entitled, *even if the party has not demanded that relief in its pleadings*"). Nor were defendants unfairly surprised by any omission of a punitive damages demand from the complaint in light of the fact that plaintiff's proposed jury instructions that were submitted several weeks before trial included a request for an instruction on punitive damages. Doc. #44 at 5-6; *see also Bowles v. Osmose Utilities Services, Inc.*, 443 F.3d 671, 675 (8th Cir. 2006) (relying on Rule 54(c) to reject argument that punitive damages were precluded because of plaintiff's failure to request punitive damages in complaint and further finding that plaintiff's notification three weeks before trial of intent to seek punitive damages gave adequate notice to the defense).[7]

---

reinforces my conclusion that defendant understood by the time of trial that plaintiff's action was necessarily proceeding in part under § 31-51q as I explain below.

[7] It is true that plaintiff's counsel later seemed to mistakenly think during trial that plaintiff could not seek punitive damages against a municipality. Doc. #66 at 4, 175. But there is no showing that defendant relied on plaintiff's counsel's misunderstanding. To the contrary, it was defendant's counsel that proposed jury instructions in accordance with Conn. Gen. Stat. § 31-51q, the statute that expressly authorizes the award of punitive damages for a First Amendment retaliation claim against a municipal employer. Doc. #41 at 6-9; *see also* Doc. #56 (defendant's mid-trial submission noting in part that "Connecticut courts have applied the constructive discharge doctrine to claims [of] free speech retaliation in violation of Conn. Gen. Stat. § 31-51q").

Defendant further argues that the complaint did not allege a violation of Conn. Gen. Stat. § 31-51q, which is the statute that served as the legal predicate for the Court to instruct the jury on punitive damages:

> Any employer, *including the state and any instrumentality or political subdivision thereof*, who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge, *including punitive damages*, and for reasonable attorney's fees as part of the costs of any such action for damages.

Conn. Gen. Stat. § 31-51q (emphasis added).

Although it is true that the complaint did not expressly cite § 31-51q, I conclude that the complaint necessarily alleged a cause of action under § 31-51q by virtue of the fact that it alleged that plaintiff was an employee who was subject to retaliation in violation of the free-speech protections of *both* the federal and state constitutions. The complaint alleged in relevant part that "[t]his is an action to redress the deprivation of rights secured to the plaintiff by the Constitution and laws of the United States and the State of Connecticut," and that defendant "retaliated against the plaintiff for having exercised rights protected by the First Amendment to the United States Constitution and by Article First, Sections Three, Four and Fourteen, of the Connecticut Constitution, which is invoked pursuant to this court's supplementary jurisdiction and because of diversity of citizenship." Doc. #1 at 5 (¶ 1).[8]

---

[8] The complaint also expressly alleged a violation of 42 U.S.C. § 1983 (Doc. #1 at 5 (¶ 2)) but of course § 1983 does not provide a cause of action for a violation of state law. *See, e.g., Young v. County of Fulton*, 160 F.3d 899, 902 (2d Cir. 1998), and it is also well-established that a cause of action under § 1983 does not allow for an award of punitive damages against a municipality. *See Ciraolo v. City of New York*, 216 F.3d 236, 238 (2d Cir. 2000). Accordingly, the only permissible basis—if any—for the Court to have instructed the jury on punitive damages was if plaintiff was proceeding under Conn. Gen. Stat. § 31-51q, which as noted expressly authorizes an award of punitive damages against a state instrumentality or political subdivision such as a municipality.

Because the complaint sought relief in part under the state constitution as well as the federal constitution, the complaint necessarily relied for its cause of action not simply upon 42 U.S.C. § 1983 but also upon § 31-51q. *See also Schumann v. Dianon Systems, Inc.*, 304 Conn. 585, 599 (2012) (explaining scope of § 31-51q); *Bracey v. Bd. of Educ. of City of Bridgeport*, 368 F.3d 108, 115 (2d Cir. 2004) (same).

Indeed, Connecticut courts have rejected the argument that the free-speech provisions of the Connecticut Constitution are independently actionable apart from the cause of action that is prescribed under § 31-51q. *See Thibault v. Barkhamsted Fire Dist.*, 2013 WL 6038259, at *5 (Conn. Super. 2013) (citing cases); *see also Blue v. Carbonaro,* 2015 WL 3555294, at *21 (Conn. Super. 2015) (same). In light of this background legal framework, it follows that the complaint must necessarily be understood to have alleged a cause of action pursuant to § 31-51q for a violation of the free-speech protections of both the federal and state constitutions.[9]

It is true that defendant asserted in passing during the course of summary judgment briefing in this case that plaintiff was *not* proceeding under § 31-51q and that plaintiff did not dispute the assertion at that time. *See* Doc. #87 (citing parties' briefing). But the Court was not called upon at summary judgment to resolve the applicability of § 31-51q, and so there is little to be drawn from stray statements or omissions in the summary judgment briefing.

---

[9] Consistent with the fact that plaintiff sought relief under both the federal and state constitutions, the jury instructions stated that plaintiff claimed retaliation "for exercising his rights to free speech as protected under the federal *and state* constitutions," Doc. #61 at 6 (emphasis added). The parties did not otherwise suggest that there were any relevant differences presented on the facts of this case between the elements of a claim under the federal constitution and a claim under the state constitution. *See* Doc. #66 at 3–4. To the extent that § 31-51q requires proof of "discipline" or "discharge" (as distinct from a general "adverse action"), the jury was instructed on the requirements for a constructive discharge, and defendant agreed that a constructive discharge is actionable under § 31-51q. Doc. #56 at 2. To the extent that § 31-51q requires proof that the protected speech activity "does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer," defendant's proposed jury instruction conceded that "[t]he defendant is not claiming that the plaintiff's alleged statements interfered with his job performance or his working relationship with his employer." Doc. #41 at 7.

More importantly, by the time that this case came up for trial and long after the Court's summary judgment ruling, defendant itself acknowledged that plaintiff was proceeding pursuant to § 31-51q when defendant submitted a proposed jury instruction under § 31-51q. *See* Doc. #41 at 6–9. The fact that defendant requested a jury instruction pursuant to § 31-51q refutes its claim that the complaint was not understood to have alleged a cause of action pursuant to § 31-51q or that defendant did not have appropriate notice that plaintiff was proceeding in part pursuant to § 31-51q as well as under 42 U.S.C. § 1983.

Even assuming that the Court has erred in some respect with the foregoing analysis, the fact remains that defendant did not object to the Court's instructing the jury on punitive damages. To the contrary, defendant's counsel—when furnished by the Court with a copy of § 31-51q and directed to its language that expressly allows for an award of punitive damages against a municipality—agreed with plaintiff's counsel's statement that "there should be a charge on punitive damages," adding that "I don't disagree with that, Your Honor. It's [the statute] pretty explicit." Doc. #66 at 175.

In light of defendant's failure to object to the Court's instructing the jury on punitive damages (or at all to the content of the Court's instruction), defendant's burden at this time is to show that that it was no less than "plain error" for the Court to have instructed the jury on punitive damages. *See* Fed. R. Civ. P. 51(d)(2); *Rasanen v. Doe,* 723 F.3d 325, 332-33 (2d Cir. 2013). I conclude that there was no error, much less plain error in the Court's decision to instruct the jury on punitive damages. Accordingly, I will deny defendant's motion to vacate the punitive damages award insofar as defendant now claims that the complaint failed to adequately allege either a request for punitive damages or a violation of § 31-51q.

*2. Sufficiency of Evidence to Support Punitive Damages Award*

Because it was not plain error to submit the question of punitive damages to the jury, and such damages are not limited to costs of suit, I turn to whether the evidence was sufficient to allow the jury to award punitive damages. The jury was permitted to award punitive damages if it found that defendant's conduct evinced a reckless indifference to the rights of others or an intentional and wanton violation of those rights. *See* Doc. #61 at 15 (jury instructions); *Arnone v. Town of Enfield*, 79 Conn. App. 501, 521 (2003) (discussing standard for award of punitive damages under § 31-51q). In arguing that the evidence was insufficient to support an award of punitive damages, defendant does little more than restate the compelling evidence that supports the jury's award and suggest that the evidence could have been less circumstantial. Doc. #70-1 at 34–35. But while the evidence was at times circumstantial, it was also competent and convincing, and it was more than sufficient to support the jury's determination that plaintiff was a victim of payback politics and that defendant acted intentionally and wantonly in violation of plaintiff's rights. I similarly reject defendant's argument that plaintiff's closing arguments unfairly characterized the evidence or constituted improper inflammation of the jury's passions. The jury properly awarded punitive damages on the grounds of the evidence I have described above that was presented at trial.

*3. Common Law Limitation on the Punitive Damages Award*

Defendant argues that the Court committed plain error when it instructed the jury to determine the amount of punitive damages without limiting the jury's award solely to the costs of litigation (including attorney's fees, less taxable costs). *See* Doc. # 71-1. Defendant concedes pursuant to Fed. R. Civ. P. 51(d)(2) that this claim of error is subject to plain-error review for failure of defendant to have sought this limitation at trial. *Ibid.*

I conclude that there was no plain error here. Defendant's argument rests on the notion that the punitive damages award should have been limited solely to the amount that is allowed as punitive damages under the common law of Connecticut. As the Connecticut Supreme Court has explained, common law punitive damages "are limited under Connecticut law to litigation expenses, such as attorney's fees less taxable costs." *Hylton v. Gunter*, 313 Conn. 472, 484 (2014). It has further noted that "common-law punitive damages are akin to statutorily authorized attorney's fees in practicality and purpose, insofar as both provide the same relief and serve the same function." *Id* at 485.

The difficulty with plaintiff's argument is that the award of punitive damages in this case was expressly authorized by statute, not by the common law or by means of any cause of action arising under the common law. The statute—§ 31-51q—does not limit the measure of punitive damages to the common law measure of attorney's fees. To the contrary, the text of the statute provides for an award of punitive damages *in addition to* an award of attorney's fees. *See* Conn. Gen. Stat. § 31-51q (providing in part that employer shall be liable for "punitive damages, *and* for reasonable attorney's fees as part of the costs of any such action for damages") (emphasis added).

In view of the acknowledged purpose of a common law measure of punitive damages merely to compensate a plaintiff for his attorney's fees, *see Hylton*, 313 Conn. at 484, the fact that § 31-51q authorizes an award of punitive damages in addition to an award of attorney's fees is a strong sign that the legislature did not intend to limit an award of punitive damages solely to the amount of plaintiff's attorney's fees. *See Bifolck v. Philip Morris, Inc.*, 324 Conn. 362, 452 (2016) ("Another factor that has influenced this court [the Connecticut Supreme Court] to

distinguish an award of statutory punitive damages from common-law punitive damages is when the statutory scheme also authorizes an award of attorney's fees.").

Moreover, the Connecticut Supreme Court has interpreted similar statutory language that appears in the Connecticut Unfair Trade Practices Act (CUTPA) to conclude that an award of punitive damages under CUTPA is not subject to the common law limitation for the award of punitive damages. *See Ulbrich v. Groth*, 310 Conn. 375, 448-52 (2013). In light of the text of § 31-51q and the reasoning of the Connecticut Supreme Court in *Ulbrich*, I conclude that it was not error to allow the jury to determine the amount of punitive damages rather than to instruct the jury to limit any punitive damages award to plaintiff's attorney's fees.[10]

Even if I am mistaken, I cannot say that any error amounted to plain error in light of a contrary decision by the Connecticut Supreme Court on this state law issue. "To constitute plain error, a court's action must contravene an established rule of law." *Lavin-McEleney v. Marist Coll.*, 239 F.3d 476, 483 (2d Cir. 2001) (citing *United States v. Olano*, 507 U.S. 725, 734 (1993)). Plain error is error that "may result in a miscarriage of justice, or [in] obvious instances of . . . misapplied law," *Girden v. Sandals Int'l*, 262 F.3d 195, 206 (2d Cir. 2001), and is a doctrine that "should only be invoked with extreme caution in the civil context." *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 18 (2d Cir. 1996). There was no plain error here.

---

[10] Not to the contrary is the Second Circuit's unpublished ruling in *McClain v. Pfizer*, 505 Fed. Appx. 59 (2d Cir. 2012), which stated in passing that for cases arising under § 31-51q "Connecticut courts apply the common law standard of punitive damages to determine when such damages are warranted." *Id.* at 62. The court in *McClain* cited *Arnone v. Town of Enfield*, 79 Conn. App. 501 (2003), a decision of the Connecticut Appellate Court that has little analysis of this issue, *id.* at 521, and in any event pre-dates the Connecticut's Supreme Court's later decisions in *Ulbrich* and *Bifolck* that emphasize the significance of statutory provisions that dually authorize punitive damages and an award of attorney's fees. *See also Perez-Dixon v. City of Bridgeport*, 2008 WL 4043662, at *5 (Conn. Super. Ct. 2008) (declining notwithstanding *Arnone* to limit punitive damages award under § 31-51q to amount of attorney's fees).

*4. Alleged Excessiveness of Punitive Damages Award*

Finally, defendant challenges the amount of punitive damages awarded by the jury as unduly excessive and seeks remittitur. Doc. #70 at 33-35. As the Second Circuit has observed, "[p]unitive damages 'are given to the plaintiff over and above the full compensation for the injuries, for the purpose of punishing the defendant, of teaching the defendant not to do it again, and of deterring others from following the defendant's example.'" *Stampf v. Long Island R. Co.*, 761 F.3d 192, 209 (2d Cir. 2014) (quoting Prosser and Keeton on the Law of Torts § 2, at 9 (5th ed.1984)). Although "[n]o objective standard exists that justifies the award of one amount, as opposed to another, to punish a tortfeasor appropriately for his misconduct," the Second Circuit has likewise stressed that "courts bear the responsibility to ensure that judgments as to punitive damages conform, insofar as reasonably practicable, to [the prevailing norms of the legal system] and are not excessive." *Ibid.* "In considering motions for a new trial and/or remittitur, 'the role of the district court is to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered.'" *Id.* at 204 (quoting *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 445 (1996)).

In deciding whether the punitive damages award was excessive, I am guided at the outset by the fact that § 31-51q specifically subjects municipalities to awards of punitive damages when they engage in free-speech retaliation and places no specific limits on the ratio of punitive damages to compensatory damages. *See Ulbrich*, 310 Conn. at 454; *MedValUSA Health Programs, Inc. v. MemberWorks, Inc.*, 273 Conn. 634, 662, 664 (2005) (noting similar absence in CUTPA of a statutory limit on punitive damages award and also absence of "a well-defined and dominant public policy against the imposition of excessive punitive damages").

I am also mindful that the United States Constitution imposes a substantive limit on the size of a punitive damages award, and that I am to consider three "guideposts" in determining the propriety of a punitive damages award: (1) the degree of reprehensibility of the defendant's conduct, (2) the relationship of the punitive damages award to the compensatory damages award, and (3) criminal and civil penalties imposed by the state's law for the misconduct in question. *See Stampf*, 761 F.3d at 209 (citing *BMW of N. Am. v. Gore*, 517 U.S. 559 (1996)); *Payne*, 711 F.3d 85, 101 (2d Cir. 2013) (same); *see also Ulbrich*, 310 Conn. at 454-55 (discussing similar factors to evaluate claim of excessive punitive damages).

I will refer to these three factors as the "*Gore* factors" in light of their namesake case precedent. Defendant's briefing perfunctorily cites these factors (Doc. #70-1 at 33) but then makes no effort to analyze how any of these factors actually apply in this case. Instead, defendant's briefing pivots to attack the fairness and accuracy of plaintiff's closing argument (and does so in *ad hominen* fashion without demonstrating that plaintiff's counsel's argument was inaccurate and despite the fact that defendant did not lodge a timely or specific objection to the complained-of statements in plaintiff's closing argument). Doc. #70-1 at 34-35.

Regardless of defendant's failure to explain how the *Gore* factors apply in this case, I will attempt to do so. The first *Gore* guidepost for my review is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award": the degree of reprehensibility of the defendant's conduct. *Gore*, 517 U.S. at 575. In considering reprehensibility, I am to consider whether the harm caused was physical as opposed to economic; whether the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; whether the conduct involved repeated actions or was an isolated incident; and whether the harm was the result of intentional malice, trickery, or deceit, or mere accident. *Id.* at 576–77.

Here, I conclude that, although the harm did not result from a reckless disregard for safety and was not a physical harm, it was a harm that involved repeated, malicious actions that the jury could reasonably have determined resulted from intentional conduct. The reprehensibility was worse because the actors were the highest leaders within the Stratford Police Department, an agency that has been tasked with upholding the laws of this state and country, not breaking them. I conclude that the first factor weighs in favor of a reduction of the punitive damages award to the extent that there was no profit motive, no threat to health or safety, and that the noxious retaliatory conduct was largely a product of banal motives and seedy small-town politics.

Turning to the second *Gore* factor (the relationship of the punitive damages award to the compensatory damages award), the punitive damages of $1.5 million is 50% more than the compensatory damages award of $1 million. As plaintiff's briefing notes, there are many examples of punitive damages awards that have well exceeded this ratio. *See* Doc. #76 at 12-14. The Court's own research—unfortunately unaided by defendant's complete failure to cite case examples—discloses additional examples of more modest awards in other First Amendment retaliation cases. *See, e.g.*, *Arnone v. Town of Enfield*, 79 Conn. App. 501 (2003) (award of $36,000 in punitive damages against public employer for First Amendment retaliation, a little less than half of compensatory damages); *Russo v. City of Hartford*, 419 F. Supp. 2d 134, 155 (D. Conn. 2006) (approving of punitive damages of $75,000 against police chief for First Amendment retaliation, more than three times the amount of compensatory damages awarded); *Moskowitz v. Coscette*, 3 Fed. App'x. 1, 6–7 (2d Cir. 2001) (approving of punitive damages of $75,000 against individual defendant for First Amendment retaliation, approximately 60% of the amount of compensatory damages awarded); *Fishman v. Clancy*, 763 F.2d 485 (1st Cir. 1985)

(approving of punitive damages of $39,000 and $26,000 against school officials for First Amendment retaliation, between five and eight times the amount of compensatory damages awarded); *Styers v. Pennsylvania*, 2008 WL 598285, at *4 (M.D. Pa. 2008) (approving of punitive damages of $20,000 for First Amendment retaliation, a ratio of 20,000:1 to nominal damages); *Hirsch v. Lecuona*, 2008 WL 2795859 (D. Neb. 2008) (approving of punitive damages of $350,000 against Nebraska commissioner of labor for First Amendment retaliation, approximately 1:1 ratio to actual damages).

Here, the ratio of punitive damages to compensatory damages is 1.5:1, which is well within the range of ratios found acceptable by other courts. But unlike many other cases, the jury here awarded very substantial compensatory damages, which raises fairness concerns about the additional punitive damages awarded. As the Supreme Court has advised: "When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003); *Payne*, 711 F.3d at 102-03 (same). All in all, the considerations under the second *Gore* factor suggest that the punitive damages award should be reduced to not more than the compensatory damages award.

As for the third *Gore* factor (comparison of the punitive damages awarded with the civil and criminal penalties for comparable misconduct), defendant does not direct the Court's attention to any state civil or criminal penalties at all, let alone those that would have been less severe than the punitive damages awarded by the jury. *See Russo*, 419 F. Supp. 2d at 155. In any event, the Court is not aware of any criminal or civil penalty schemes that would apply to the kind of intra-departmental retaliatory conduct that took place in this case. The absence of any

such scheme is a further indication that the punitive damages awarded in this case are somewhat above the amount that is reasonable and just.

I am mindful as well that punitive damages assessed against municipalities may burden local treasuries and their taxpayers, *see City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 267–71 (1981), but the Connecticut legislature evidently considered and rejected the public policy argument that municipalities should not bear the brunt of any punitive damages awards in cases involving free-speech retaliation against their employees. Moreover, the absence of evidence at trial about the defendant's financial condition weighs against remittitur, Doc. #70-1 at 34, because "[t]he duty . . . is on the defendant to present evidence, before the jury renders its verdict and on appeal therefrom, of his limited resources if he wishes that factor to be weighed in the calculation of punitive damages." *Provost v. City of Newburgh*, 262 F.3d 146, 163 (2d Cir. 2001).

On balance and in light of all the applicable factors and considerations, I conclude that the punitive damages award should be reduced by remittitur to $500,000. A punitive damages award of $500,000 will be sufficient to punish defendant for the acts of its upper-level policymakers whom the jury could reasonably have found acted reprehensibly in following a course of ugly intrigue that society should not tolerate of those tasked with upholding our laws. A punitive damages award of $500,000 will likewise deter other municipalities from suppressing speech and oppressing employees who raise concerns about municipal corruption.

### Attorney's Fees

The last motion before me is plaintiff's motion for attorney's fees (Doc. #74). Plaintiff seeks an award of attorney's fees of $833,333, commensurate with one-third of the total damages award in this case and in accordance with the amount provided under the written retainer

agreement (Doc. #83-1). Plaintiff stakes his motion solely on the attorney's fee recovery provision of Conn. Gen. Stat. § 31-51q, rather than the cognate attorney's fees provision under federal law, 42 U.S.C. § 1988. According to plaintiff, as a matter of state law, he is entitled to an award of attorney's fees on the simple basis of his contingency fee arrangement and without respect to the multiple factors that are ordinarily considered for an attorney's fee award under federal civil rights statutes. *See, e.g., Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 550-54 (2010) (discussing federal factors for award of attorney's fees under 42 U.S.C. § 1988).

Under Connecticut law, the Connecticut Supreme Court has instructed that "when a contingency fee agreement exists, a two step analysis is required to determine whether a trial court permissibly may depart from it in awarding a reasonable fee pursuant to statute or contract." *Schoonmaker v. Lawrence Brunoli, Inc.*, 265 Conn. 210, 270 (2003). First, a court "must analyze the terms of the agreement itself," and "[i]f the agreement is, by its terms, reasonable, [then] the trial court may depart from its terms only when necessary to prevent substantial unfairness to the party, typically a defendant, who bears the ultimate responsibility for payment of the fee." *Id.* at 270-72. Only "if the trial court concludes that the agreement is, by its terms, unreasonable, it may exercise its discretion and award a reasonable fee in accordance with the factors enumerated in rule 1.5(a) of the Rules of Professional Conduct." *Id.* at 272.

I have examined the retainer-and-fee agreement and conclude that plaintiff's one-third contingency fee arrangement is permissible and reasonable. *See, e.g., Fraser v. Wyeth, Inc.*, 2013 WL 4012764, at *7 (D. Conn. 2013) ("conclud[ing] that Plaintiffs' contingency fee agreement providing for a 33.33% contingency fee is reasonable"). This fee is not unreasonable in light of the long-accepted grounds that allow for percentage-based contingent fee arrangements. *See, e.g., McCullough v. Waterside Associates*, 102 Conn. App. 23, 29-30 (2007); *see also Sorrentino*

*v. All Seasons Services, Inc.*, 245 Conn. 756, 775 (1998) (reversing trial court departure from contingency fee arrangement for purposes of fee award).

Nor is it unfair to allow for a contingency fee that is based in part on the award of punitive damages. The success of plaintiff's counsel in this case is properly measured in part by his ability to persuade the jury that there were aggravated circumstances in this case that made an award of punitive damages was appropriate.

On the basis of compensatory damages of $1 million and punitive damages as subject remittitur of $500,000, the Court concludes that an award of attorney's fees in the amount of $500,000 is reasonable and consistent with Connecticut law that governs the award of attorney's fees pursuant to Conn. Gen. Stat. § 31-51q. Accordingly, I will grant plaintiff's motion for attorney's fees in part in the amount of $500,000, subject to plaintiff's acceptance of the Court's order of remittitur with respect to the award of punitive damages.

## CONCLUSION

For the reasons stated above, defendant's motions for judgment as a matter of law and for a new trial (Doc. #70) and to alter or amend the judgment (Doc. #71) are DENIED, subject to the Court's remittitur of the punitive damages award to an amount of $500,000. Plaintiff shall file a statement by July 14, 2017, whether he accepts the Court's remittitur of the punitive damages award or whether he wishes the Court instead to grant a new trial. Plaintiff's motion for attorney's fees (Doc. #74) is GRANTED in part in the amount of $500,000, subject to plaintiff's acceptance of the Court's remittitur of the punitive damages award.  It is so ordered.

Dated at New Haven, Connecticut this 27th day of June 2017.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge